DYK, Circuit Judge,
dissenting.
I
For the first time in 26 years, this court has taken an obviousness case en banc. See In re Dillon, 919 F.2d 688 (Fed. Cir. 1990) (en banc). Remarkably, the majority has done so without further briefing and argument from the parties, amici, or the government, as has been our almost uniform practice in this court’s en banc decisions.[1] Failure to ask for the government’s views is particularly significant given the ramifications of this issue for the U.S. Patent and Trademark Office (“PTO”). This has deprived the parties and amici of the opportunity to express them views on these important issues, and has deprived this court of the opportunity to consider these issues in light of those views.
Obviousness is the most common invalidity issue in both district court and post-grant proceedings before the PTO.[2] The importance of our obviousness jurisprudence to the intellectual property community is evidenced by, for example, the 38 amicus briefs filed in KSR International Co. v. Teleflex Inc., 550 U.S. 398, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007), including an amicus brief by the government, and the multiple amicus briefs filed in our last obviousness en banc case. The present en banc decision will have a significant and immediate impact on the future resolution of obviousness issues. While purporting to *1075 apply established circuit law, the majority is in fact making significant changes to the law as articulated by the Supreme Court. Indeed, as Judge Reyna convincingly points out, it is difficult to understand how this case would satisfy the requirements for en banc review if the majority’s purpose were not to clarify the law.
The majority states that it takes this case en banc to correct the original panel’s reliance on extra-record evidence. Maj. Op. at 1038-40. This could hardly be the reason the majority has granted en banc review, since the panel has continuingly expressed willingness, and indeed desire, to eliminate references to any extra-record evidence because of concerns raised in Apple’s petition for rehearing and because they were unnecessary to the panel opinion.
While for the most part the majority does not express its shifts in obviousness principles explicitly,' an examination of the majority’s opinion makes clear its substantial impact on the law of obviousness. And that impact will not be a positive one, for the principles that the majority announces are inconsistent with the Supreme Court’s decisions in KSR, Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), as well as earlier Supreme Court cases, and will make proof of obviousness far more difficult.
The majority complains that the parties themselves did not “raise big questions about how aspects of the obviousness doctrine ought to operate.” Maj. Op. at 1039. But that is exactly the point. The majority makes significant changes to the law of obviousness even though these important issues are raised by the court sua sponte without the opportunity by the parties and amici to address them, or the majority adopts previous panel decisions on obviousness that the parties could address only at the en banc level.
I agree with Chief Judge-Prost’s dissent, which ably points out that even under the majority’s view that the issues are factual rather than legal, there is not substantial evidence to support the result the majority reaches on the issue of obviousness. The flimsy nature of the evidence found by the majority to support the jury verdict emphasizes the dangers of inviting factfinding to dominate the obviousness determination. Quite apart from the question whether the jury’s factfinding was supported by substantial evidence, is the fact that these asserted factfindings are largely irrelevant to the legal question of obviousness.
I write separately to point out the profound changes in the law of obviousness that the majority creates and to point out the majority’s errors in its approach to claim construction of the '647 patent.
II
First, the majority turns the legal question of obviousness into a factual issue for a jury to resolve, both as to the sufficiency of the motivation to combine and the significance to be given to secondary considerations.
KSR explicitly rejected the contention that obviousness is always a matter of fact requiring jury resolution. In KSR, the pat-entee argued that the question of motivation to combine was for the jury. See Brief for Respondents, KSR Int’l Co. v. Teleflex Inc., 550 U.S. 398 (2007) (No. 04-1350, 2006 WL 2989549, at *45. The Supreme Court rejected this contention, holding that this question was properly resolved on summary judgment because “[t]he ultimate judgment of obviousness is a legal determination. Where, as here, the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in *1076 light of these factors, summary judgment is appropriate.” KSR, 550 U.S. at 427, 127 S.Ct. 1727 (internal citations omitted). Thus, while “the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art” potentially present fact issues, the KSR Court determined that the sufficiency of the motivation to combine was not a factual .issue, and that in the particular case “it was obvious to a person of ordinary skill to combine” the prior art. Id. at 424, 127 S.Ct. 1727.
Here too, “the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute,” id. at 427, 127 S.Ct. 1727, and there is no indication that the combination of the relevant prior art does more than yield a predictable result. Yet the majority holds that the question of the sufficiency of the motivation here was a jury question. This is inconsistent with KSR.
For secondary considerations, Graham and KSR explained that both the significance and the weighing of secondary considerations are for the court. Secondary considerations “focus attention on economic and motivational rather than technical issues and are, therefore, more susceptible of judicial treatment than are the highly technical facts often present in patent litigation.” Graham, 383 U.S. at 35-36, 86 S.Ct. 684, The specific holdings in Graham and KSR themselves demonstrate that both the significance and the weighing of secondary considerations are legal issues for the court. Even as an appellate court, the Supreme Court in Graham determined that “these [secondary] factors do not, in the circumstances of this case, tip the scales of patentability.” 383 U.S. at 36, 86 S.Ct. 684. Similarly, the KSR Court “conclude[d] [that] Teleflex has shown no secondary factors to dislodge the determination that claim 4 is obvious.” 550 U.S. at 426, 127 S.Ct. 1727. Again, the majority’s approach—turning the significance of secondary considerations into a factual question—is contrary to Graham and KSR.
HI
Second, the majority lowers the bar for nonobviousness by refusing to take account of the trivial nature of the two claimed inventions. With respect to the 721 patent, the slide to unlock feature was known in the prior art (Neonode) and the only innovation is an image associated with the sliding gesture from fixed starting to ending points.[3] See Maj. Op. 1049-50. With respect to the 172 patent, the autocorrect feature was known in the prior art (Robinson), and the only innovation is displaying contemporaneously the text to be autocor-rected. See Maj. Op. 1059-61. Such text displays have long been known in the prior art (though not specifically in connection with autocorrect display).
Treating such minimal advances over the prior art as nonobvious is contrary to KSR, where the Supreme Court confirmed that the obviousness doctrine is designed to ensure that “the results of ordinary innovation are not the subject of exclusive rights under the patent laws.” KSR, 550 U.S. at 427, 127 S.Ct. 1727. On the face of these patents, only ordinary, indeed trivial, *1077 innovation .is involved. The majority’s holding that these trivial features can. render a patent nonobvious will have a significant impact on future cases.
IV
Third, the majority concludes that combinations of prior art used to solve a known problem are insufficient to render an invention obvious as a matter of law. According to the majority, there must be evidence of a specific motivation to combine. See Maj. Op. at 1051-53. Both aspects of these conclusions are contrary to KSR.
Under KSR, the existence of each patented feature in the prior art is alone not sufficient to establish obviousness. See KSR, 550 U.S. at 418, 127 S.Ct. 1727. There must be a reason to make a combination. But KSR holds that the reason may be found as a matter of law in the solution to a known problem. KSR was quite clear that the existence of a known problem suffices: “[o]ne of the ways in which a patent’s subject matter can be proved obvious is by noting that there existed at the time of invention a known problem for which there was an obvious solution .... ” KSR, 550 U.S. at 419-20, 127 S.Ct. 1727. “[W]hen a patent simply arranges old elements with each performing the sanie function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious.” Id. at 417, 127 S.Ct. 1727 (internal quotations omitted). “[T]he simple substitution of one known element for another” makes the' claimed invention obvious. Id.
In holding that the existence of a known problem is sufficient reason to combine prior art references, the Court specifically rejected our court’s holding in KSR that the existence of a known problem was insufficient. Teleflex, Inc. v. KSR Int’l Co., 119 Fed.Appx. 282, 288 (Fed. Cir. 2005) (requiring that in addition to noting “the problem to be solved, ... the district court was [also] required- to make specific findings as to whether there was a suggestion or motivation to combine the teachings of [the prior art addressed to the same problem] in’the particular manner claimed”), rev’d, 550 U.S. 398, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007).
KSR also held, contrary to the majority, that evidence of a specific motivation to combine is not required. The Court rejected our court’s, approach in requiring a “specific understanding or principle” that creates a specific motivation to combine. See 550 U.S. at 414, 127 S.Ct. 1727. In KSR itself, the combination was held obvious despite no “precise teachings” to combine the previous references. See id. at 418, 127 S.Ct. 1727.
Earlier decisions of the Supreme Court relied on by KSR reflect the same approach. First, KSR explained that United States v. Adams taught that “when a patent claims a structure' already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result.” Id. at 416, 127 S.Ct. 1727 (citing 383 U.S. 39, 40, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966)). Second, KSR explained that Anderson’s-Black Rock v. Pavement Salvage Co. taught that when “two [prior art references] in combination d[o] no more than they would in separate, sequential operation ..., while the combination of old elements perform[s] a useful function, it add[s] nothing to the nature and quality of the. ... already patented, and the patent fail[s] under § 103.” Id. at 417, 127 S.Ct. 1727 (internal quotation marks omitted) (citing 396 U.S. 57, 60-62, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969)). Finally, KSR explained that Sakraida v. Ag Pro, Inc. *1078 taught that “when a patent simply arranges old elements with each performing the- same function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious.” Id. (internal quotation marks omitted) (citing 425 U.S. 273, 282, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976)). The KSR Court held that the “principles underlying these eases are instructive when the question is whether a patent claiming the combination of elements of prior art is obvious..:. Sakmida and Anderson’s-Black Rock are illustrative—a court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions.” Id. Thus, under KSR, the existence of a known problem solved by the combination can render that combination obvious as a matter of law and without further evidence of a specific motivation to combine.
Here, the inventions combine features known in the prior art. With respect to the '721 patent, Apple does not dispute, and the majority agrees, that the combination of the prior art Neonode and Plaisant references produces the claimed invention. Maj. Op. at 1050-51. As discussed below, the same is true with respect to the '172 patent (combining the Robinson, Xrgomics, and other prior art references). There is no claim that either combination yielded unpredictable results. Both of the patents also address a known problem. With respect to the '721 patent, the problems are ease-of-use and avoidance of inadvertent activation. With respect to the '172 patent, the problem is the need to see text entries. Contrary to KSR, the majority,now holds that a known problem is not sufficient and that there must be evidence of a specific motivation.
V
■ Fourth, the majority errs in cabining the relevant technology in the field of prior art. The majority invites the factfinder to dismiss prior art evidence on the theory that it concerns a different device than the patented invention, even if the references are directed to solving the same problem and pertain to a related device. For example, with respect to the '721 patent, the majority holds that the jury could dismiss the Plaisant reference because it was directed to walk-mounted rather than portable devices. Maj. Op. at 1051-52. With respect to the '172 patent, the majority makes much of the distinction between word correction versus word completion, rejecting Xrgomics as relevant prior art on that basis, and ignoring the extensive prior art showing text display as a routine feature. Maj. Op. at 1060-61.
The Supreme Court in KSR rejected the theory that prior art addressing the same problem can be dismissed because it concerns a different device. “[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.” KSR, 550 U.S. at 417, 127 S.Ct. 1727. In other words, the question is not whether the art involves precisely the same device. The question is whether it addresses the same problem within the same general field. “Under the correct analysis, any need or problem known in the field ... and addressed by the patent can provide a reason for combining the elements in the manner claimed.” KSR, 550 U.S. at 420, 127 S.Ct. 1727.
For example, in Graham, the patentee argued that prior art disclosing a container for other liquid sprayers was in a different field of art than the patented insecticide sprayer. The Court held that a “restricted *1079 ... view of the applicable prior art is not justified. The problems confronting [the patentee] and the insecticide industry were riot insecticide problems; they were mechanical closure problems. Closure devices in such a closely related art as pouring spouts for liquid containers are at the very least pertinent references.” 383 U.S. at 35, 86 S.Ct. 684. In fact, this principle dates'as far back as Hotchkiss v. Greenwood, 52 U.S. (11 How.) 248, 13 L.Ed. 683 (1851). In that case, the use of porcelain in a different field was held to be sufficiently related to the us,e of porcelain in doorknobs. Id. at 254.
In short, the proper inquiry is whether the prior art references address the same problem in a related area. The '172 patent involves text display for word correction. There is no question that the prior art also addresses the problem of displaying a typed text so that it can be viewed by the user; Xrgomics concerns the related art of text completion. The majority concludes that the missing element is not present in the prior art Xrgomics device because the art is in a different technology, specifically text completion as opposed to text correction. Maj. Op. at 1060-61. However, Samsung presented uncontroverted evidence, quite apart from Xrgomics, that “anyone who’s used a computer since the late 1970s would be familiar with this idea” of displaying the full text of what a user is typing. J.A. 12024-25. The '172 patent itself recognizes this relatively broad field of prior art, as its specification states that the disclosed invention “relate[s] generally to text input on portable electronic devices.” '172Patent, col. 111. 15-16.
• The '721 patent concerns unlocking touchscreen devices. Here, the prior art dismissed by the majority is, by the majority’s own admission, art that concerns the general field of touchscreen devices. See Maj. Op. at 1058. Thus, there is no question that the two prior art references address the same problem in related areas. Nonetheless, the majority urges that “an ordinary artisan would not have been motivated to combine elements from a wall-mounted touchscreen for home appliances and a smartphone, particularly in view of the ‘pocket-dialing[1] problem specific to mobile devices that Apple’s invention sought to address.” Maj. Op. at 1052 (quoting the District Court’s analysis). The majority errs in two respects. First, the '721 patent is not limited to cell phones or to the cell phone pocket-dialing problem, and indeed makes no reference to a pocket-dialing problem. The '721 patent is directed to portable devices generally, and to ease of use and inadvertent activation with respect to all such devices. Second, the Plaisant prior art was concerned with the same problems as the '721 patent in the field of touch screen devices. Plaisant indicated that the study’s “focus is on providing ... systems that are easy for the home owner to use.” J.A. 20742. Plaisant also indicated that an “advantage of the sliding movement is that it is less likely to be done inadvertently.” J.A. 20743. Plaisant was thus directed to solving the same problem in the same area as the patented invention.[4]
The majority’s approach will create significant opportunities to dismiss relevant prior art and find almost any patent non-obvious by narrowly defining the relevant technology. In this respect, the en banc *1080 decision will work a significant change on future cases in the district courts and the PTO.
This change is evident from comparing the majority’s holding here to our past jurisprudence. We have previously held that “[a] reference is reasonably pertinent if, even though it may be in a different field from that of .the inventor’s endeavor, ... [it] logically would have commended itself to an inventor’s attention in considering his problem.” In re Clay, 966 F.2d 666, 659 (Fed. Cir. 1992). “We therefore have concluded, for example, that an inventor considering a hinge and latch mechanism for portable computers would naturally look to references employing other housings, hinges, latches, springs, etc., which in that case came from areas such as a desktop telephone directory, a piano lid, a kitchen cabinet, a washing machine cabinet, a wooden furniture cabinet, or a two-part housing for storing audio cassettes.” In re ICON Health & Fitness, Inc., 496 F.3d 1374, 1380 (Fed. Cir. 2007) (internal quotation marks omitted). Even if cited prior art references “are not within the same field of endeavor ..., such references may still be analogous if they are reasonably pertinent to the particular problem with which the inventor is involved.” In re Paulsen, 30 F.3d 1475, 1481 (Fed. Cir. 1994) (internal quotation marks omitted).
Not only does the majority alter our jurisprudence with respect to distinct court proceedings, its approach would affect patent examiners who are currently instructed that analogous prior art “does not require that the reference be from the same field of endeavor as the claimed invention.” Manual of Patent Examination Procedure § 2141.01(a).
VI
Fifth, the majority errs in elevating secondary considerations of nonobviousness beyond their role as articulated by the Supreme Court. Secondary considerations “without invention[ ] will not make patent-ability.” Sakraida, 425 U.S. at 278, 96 S.Ct. 1532 (internal quotation marks omitted). Thus, when, as here, a patent is plainly not inventive, that is, when the prima facie case of obviousness is strong, secondary considerations carry little weight.
The majority holds that secondary considerations must “always” be considered and that even a strong case of obviousness involving small advances in the prior art can be outweighed by secondary considerations. Maj. Op. at 1048. Here, the majority is quite explicit. It concludes that “[t]o the extent that Samsung’s [arguments] should be interpreted as precluding a jury finding of long-felt need favoring non-obviousness when the difference between the prior art and the claimed invention is small, we reject such a categorical rule. This type of hard and fast rule is not appropriate for the factual issues that are left to the province of the jury.” Maj. Op. at 1056. In this respect, the majority effectively overrules our earlier decision in George M. Martin Co. v. Alliance Machine Systems International LLC, which held that “[t]he district court correctly concluded as a matter of law that the differences between the prior art and the claimed improvement were minimal,” 618 F.3d 1294, 1302 (Fed. Cir. 2010), and that “[w]here the differences between the prior art and the claimed invention are as minimal as they are here, ... it cannot be said that any long-felt need was unsolved,” id. at 1304. The majority’s approach to other secondary considerations mirrors its discussion of long-felt need. But under Supreme Court authority, secondary considerations are insufficient to outweigh a strong case of obviousness involving small advances over the prior art.
*1081 KSR and Graham assigned a limited role to secondary considerations. KSR required inquiry into secondary considerations only “where appropriate.” 550 U.S. at 415, 127 S.Ct. 1727 (emphasis added). In Graham, secondary considerations are referred to as factors that “might be utilized to give light to the circumstances.” 383 U.S. at 17, 86 S.Ct. 684 (emphasis added). For example, the Graham Court weighed (in evaluating the Seoggin insecticide sprayer patent) that despite the presence of “long-felt need in the industry” and “wide commercial success” of the patentee, “these factors do not, in' the circumstances of this case, tip the scales of patentability.” 383 U.S. at 35-36, 86 S.Ct. 684. This was so because in that case the invention “rest[ed] upon exceedingly small and quite non-technieal mechanical differences in a device which was old in the art.” Id. at 36, 86 S.Ct. 684. Similarly, even though the patentee in KSR introduced evidence of commercial success, 550 U.S. at 413, 127 S.Ct. 1727, the Court dismissed it because it “conclude[d] Teleflex has shown no secondary factors to dislodge the determination that claim 4 is obvious.” Id. at 426, 127 S.Ct. 1727.
Before Graham, the Supreme Court repeatedly held that courts should give secondary considerations limited weight in the ultimate legal determination of obviousness and that the courts need not consider them where the claimed invention represents a small advance and there is a strong case for obviousness. For example, Jungersen v. Ostby & Barton Co. taught that “[t]he fact that this process has enjoyed considerable commercial success ... does not render the patent valid. It is true that in cases where the question of patentable invention is a close one, such success has weight in tipping the scales of judgment toward patentability. Where, as here, however, invention is plainly lacking, commercial success cannot fill the void.” 335 U.S. 560, 567, 69. S.Ct. 269, 93 L.Ed. 235 (1949) (citations omitted). Similarly, in Dow Chemical Co. v. Halliburton Oil Well Cementing Co., the Court explained that “petitioner claims that the Grebe-Sanford process has filled a long-felt want and has been a commercial success. But these considerations are relevant only in a close case where all other proof leaves the question of invention in doubt. Here the lack of invention is beyond doubt and cannot be outweighed by such factors.” 324 U.S. 320, 330, 65 S.Ct. 647, 89 L.Ed. 973 (1945) (citations omitted). Goodyear Tire & Rubber Co. v. Ray-O-Vac Co. cautioned that “[tjhese factors [are] entitled to weight in determining whether the improvement amounted to invention and should, in a close case, tip the scales in favor of patent-ability.” 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721 (1944).[5] These pre-KSR “decisions remain binding precedent until [the Supreme Court] see[s] fit to reconsider them .... ” Hohn v. United States, 524 U.S. 236, 252-53, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998).
This case also is not a close one. The combination of references, the known problem, the predictable results, and the exceedingly small differences from the pri- *1082 or art make the combination evident and secondary considerations insufficient as a matter of law.
VII
Finally, even if secondary considerations in this case were legally relevant, the majority fails to compare to the closest prior art to properly assess the innovation over the prior art. Secondary considerations must be directed to what is claimed to be inventive, because secondary considerations “without invention[ ] will not make patentability.” Sakraida, 425 U.S. at 278, 96 S.Ct. 1532 (internal quotation marks omitted). It requires comparison to prior art that reflects known advances. In other words, there must be a demonstrated nexus to the claimed invention—a nexus to what is new in comparison to the prior art. Furthermore, the proponent of such evidence of secondary considerations, in this case Apple, “bears the burden of showing that a nexus exists between the claimed features of the invention and the objective evidence offered to show nonobviousness.” WMS Gaming, Inc. v. Int’l Game Tech., 184 F.3d 1339, 1359 (Fed. Cir. 1999).
Our court has previously adopted the closest prior art as the relevant comparison for secondary considerations. In Bristol-Myers Squibb Co. v. Teva Pharmaceuticals USA, Inc., we noted that “the district court found evidence of some secondary considerations of nonob-viousness .... To be particularly probative, evidence of [secondary considerations] must establish that there is a difference between the results obtained and those of the closest prior art ....” 152 F.3d 967, 977 (Fed. Cir. 2014) (emphasis added) (internal quotation marks omitted). In another example, in Kao Corp. v. Unilever United States, Inc., we observed that while the “district court ... concluded ... that secondary considerations ... were sufficient to rebut the prima facie case, ... the district court failed to use the closest prior art.” 441 F.3d 963, 969 (Fed. Cir. 2006) (emphasis added). Thus, ascertaining the significance of the innovative leap over the prior art using secondary considerations requires a comparison to the closest pri- or art. This framework no longer governs under the majority’s approach.
The majority’s secondary considerations analysis repeatedly compares the '721 and '172 patents to inferior or non-existent pri- or art, rather than to the relevant, closest prior art. Specifically, the evidence relied upon by the majority with respect to the secondary considerations makes no comparison, with respect to the '721 patent, to Neonode and the claimed innovation of the image associated with the slide to unlock feature, and with respect to the '172 patent, to Robinson and the claimed innovation of displaying the currently typed string of text.
For example, for commercial success, Apple and the majority rely on survey evidence developed for Apple’s damages case that consumers are more likely to purchase (and pay more for) a phone with a slide to unlock feature and an autocor-rect function than a phone without these features. Maj. Op. at 1054-55, 1061. However, this is an irrelevant comparison because Neonode provides a slide-to-unlock feature and Robinson provides an autocor-rect function. There was no showing of nexus between the inventive steps (over the closest prior art) disclosed by the '721 and '172 patents and the surveyed consumer demand. For long-felt but unresolved need, the majority compares to an older Nokia device with a very different non-touchscreen, button-based unlocking feature, Maj. Op. at 1057, as well as to Samsung touchscreen unlocking mechanisms that do not have the slide-to-unlock feature *1083 of Neonode, Maj. Op. at 1057-58. The majority also cites Steve Job’s unveiling of the slide to unlock feature at an Apple event and the audience’s cheers as evidence of industry praise for the '721 patent. Maj. Op. at 1054. Again, however, Apple provides no evidence that this praise was specifically for the '721 patent’s innovative step beyond Neonode or even that the audience was comprised of industry experts. The majority thus errs in elevating such irrelevant comparisons as providing “particularly strong” and “powerful[ ]” evidence of nonobviousness. Maj. Op. at 1058-59.
In summary, the majority decision here materially raises the bar for obviousness by disregarding Supreme Court precedent.
VIII
A
Finally, I address the '647 patent which presents issues of infringement rather than obviousness. The “analyzer server” limitation requires that the analyzer server “run” separately, and there is no substantial evidence that Samsung’s devices embody the “analyzer server” limitation because the shared library code does not run separately. That the majority substitutes its own claim construction (requiring only separate storage) for the parties’ agreed construction that the analyzer server must “run” separately is both improper and unwise.
In Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc., the Supreme Court made clear the principle “that a judge, in construing a patent claim, is engaged in much the same task as the judge would be in construing other written instruments, such as ... contracts.” — U.S. -, 135 S.Ct. 831, 833, — L.Ed.2d - (2015). In the contract area, it is established that the parties’ interpretation of the contract’s terms is generally entitled to significant if not dispositive weight.[6] The same should be true where the parties agree as to the meaning of technical terms in infringement litigation, where the outcome affects only the particular parties to the dispute. The majority here inappropriately declines to give the parties’ agreed claim construction any weight, much less significant or dis-positive weight.
B
In the original Motorola claim construction, an “analyzer server” must be a “server routine,” consistent with the “plain meaning of ‘server.’” 757 F.3d at 1304. That is, the analyzer server must run separately from the client application it serves. Id. Both parties agreed at oral argument to this construction. Apple’s counsel stated that “we agree actually that [the analyzer server] has to be run sepa *1084 rately from the client.” Oral Argument at 29:29-35. Samsung’s counsel likewise agreed that the analyzer server “must run” separately from the client. Id. at 7:25-26. This agreed-upon construction was reiterated by the parties on their petitions for rehearing. Apple argued that Samsung’s shared library code is an analyzer server because it “runs separately from the client applications it serves.”[7] Samsung responded that Apple had failed to show infringement of “an analyzer server that ran separately from the program it serves.”[8]
Running separately is indeed the only construction which is consistent with an “analyzer server” program that “receives data having structures from the client,” processes the data, and then returns it to the client. Motorola, 757 F.3d at 1304-05.[9] The so-called “library program” present in the accused Samsung device cannot be an “analyzer server” and thus cannot satisfy the claim limitation. The parties’ experts agreed that a library program is a collection of code that can be accessed by other applications in the accused Samsung device.[10] As the name implies, a client application can go to the software library and “borrow” (i.e., use) code from the library to perform a specific needed task rather than having to program that functionality into the client application. As we held in Motorola, in the required client-server implementation, the client sends information to an independent server which then performs a task using that information and sends infoi’mation back to the client application. See 757 F.3d at 1304-05. That is not what a library program does.
The majority explicitly rejects the parties’ agreed construction and affirms the infringement verdict on the basis of its own claim construction that an “analyzer server” requires only separate storage. Maj. Op. at 1041-42, 1044-45. Something which is “stored” separately is not “run” separately. The majority’s approach is inconsistent with our appellate function.
The majority claims that the dissent takes Apple’s concession that the analyzer server must run separately “out of context.” Maj. Op. at 1043. Apple’s statement as to claim scope was no slip of the tongue. It was repeated four times at the oral argument,[11] and reiterated explicitly in the Apple petition for rehearing.
The majority also makes much of Apple’s insistence that there is no claim construction requirement that the analyzer server- be a “standalone” program, and that the panel erred in equating running separately with a standalone program. Running separately and being standalone *1085 may indeed.be different concepts (because standalone implies that no assistance .is provided by other hardware or software), but that makes no difference to this case. Even if the claim construction does not require a standalone program, the analyzer server still “must run separately from the program it serves.” Panel Op., 816 F.3d 788, 796.
Separate storage is not separate running. Crucially, there is no evidence in the record that shared library code runs separately, or is capable of running separately. Apple’s expert only testified that the accused code, uses the shared library code; he admitted that the shared library code was incapable of running separately. See J.A. 13054 (testifying that the shared library code could not run “outside - of the client application”); Apple Inc. v. Samsung Elecs. Co., No. 5:12-cv-630, Trial Tr. of Apr. 28, 2014 at 3052, EOF No. 1928 (agreeing that the accused code “can’t run on its own”); J.A. 13035 (testifying thaj; the Samsung applications “go to that code and use it where it is each time they want to access that code” (emphasis added)); J.A. 13036 (“And all those applications go to the shared library code in the' one place that exists in the computer memory hardware to use it.” (emphasis added)); J.A. 13037 (testifying that Samsung application software “has access to the code and it goes to the code where it is and uses it there” (emphasis added)). In other words, it is the client, not the analyzer server, that runs the library program. The library program is not run separately by the analyzer server as required by the claim.
C
There are important reasons why an appellate court should not reject the parties’ agreed claim construction. In this case as in other patent cases, we are dealing with complex technology that is beyond the knowledge of lay judges. “[T]he- judiciary ... is most ill-fitted to discharge the technological duties cast upon it by patent legislation.” Graham, 383 U.S. at 36, 86 S.Ct. 684. “[Consciousness of their limitations should make [the courts] vigilant against importing their own notions of the nature of the creative process .... ” Marconi Wireless Tel. Co. v. United States, 320 U.S. 1, 61-62, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943) (Frankfurter, J., dissenting). Substituting the views of lay judges for the agreement of the parties, who are intimately familiar with the technology, risks getting the construction quite wrong. This is exactly what happened here. The majority got the claim construction wrong, as a result of its freelance reinterpretation of “analyzer server” which departs from the parties’ agreed-upon construction. It is difficult enough for the court to arrive at- a claim construction when the parties disagree. Courts should be very wary to override the parties’ agreement as to claim construction when the parties are the experts in the technical matters.
For all- these reasons, I respectfully dissent.

. Over the last 10 years, the court extended supplemental briefing or argument from parties in 36 en banc cases; in only three cases did we not do so.

. See 2-5 Chisum on Patents § 5.06 (2015) ("The nonobviousness requirement of Section 103 is the most important and most litigated of the conditions of patentability.”).

. Courts in other countries have uniformly found the '721 patent invalid. See Oral Argument 18:48-19:05 ("All the other jurisdictions of the world who have considered the '721 patent ... have invalidated it ... based on obviousness from these references."); HTC Eur. Co. v. Apple Inc., [2013] EWCA (Civ,) 451 (Eng.); The Hague District Court, 24 Aug. 2011, Apple v. Samsung, Docket Nos. 396957/KG ZA 11-730 and 396959/KG ZA 11-731; Bundesgerichtshof [BGH] [Federal Court of Justice] Aug. 25, 2015, X ZR110/13 (Ger,).

. Even if the '721 patent had identified the pocket-dialing problem, the Supreme Court in KSR made clear that the prior art need not solve all problems or even address the specific problems that motivated the patentee. 550 U.S. at 420, 127 S.Ct. 1727. Here, moreover, the pocket dialing problem would provide an additional reason to combine, not a reason not to combine.

. Anderson''s-Black Rock taught that although "[i]t is ... fervently argued that the combination filled a long felt want and has enjoyed commercial successf,] ... those matters without invention will not make patentability.” 396 U.S. at 61, 90 S.Ct. 305 (internal quotation marks omitted) (citations omitted). Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp. similarly taught, that "[t]he Court of Appeals and the respondent both lean heavily on evidence that this device filled a long-felt want and has enjoyed commercial success. But commercial success without invention will not make patentability.” 340 U.S. 147, 153, 71 S.Ct. 127, 95 L.Ed. 162 (1950). These cases are cited with approval in KSR or Graham. See 550 U.S. at 416-17, 127 S.Ct. 1727; 383 U.S. at 6, 86 S.Ct. 684.

. ■ "Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning.” Restatement (Second) of Contracts § 20l(l) (1981). In contract interpretation, "it [is] clear that the primary search is for a common meaning of the parties, not a meaning imposed on them by the law.” Id. cmt. c. "[AJuthority ... supports giving effect to a common meaning shared by both parties in preference to” a meaning imposed by the courts. 2 Farnsworth on Contracts (3d) § 7.9 (2004). See also 5 Corbin on Contracts (Rev.) § 24.5 (1998) (When "the parties attach the same meaning to a contract term ..., the contract is enforceable in accordance with that meaning.”). This principle has been applied as well by the Courts of Appeals. See Ahmad v. Furlong, 435 F.3d 1196, 1203 (10th Cir. 2006) (recognizing the impropriety of "a court's resolving a contractual ambiguity contrary to the intent of both contracting parties.”); James v. Zurich-Am. Ins. Co. of Ill., 203 F.3d 250, 255 (3d Cir. 2000) ("p]he consistent practical construction given to that provision by the parties to the contract controls its terms.”).

. Apple Inc.'s Corrected Combined Petition for Panel Rehearing and Rehearing En Banc 5, ECF No. 93.

. Response to Combined Petition for Panel Rehearing and Rehearing En Banc 6, ECF No. 97 (internal quotation marks omitted),

. This is consistent with the district court’s finding that an analyzer server is “a server routine separate from a client that receives data having structures from the client,” and is "definitely separate from the [client] applications.” J.A. 46-47 (internal quotation omitted).

. , See J.A. 13054 (Apple expert testifying that software library code is "written as software that any program can go and access and execute”); J.A, 1.1792 (Samsung expert testifying that software libraries are "bits of code that exist so that all programmers can use them”).

. Oral Arg. at 29:30-35 ("We agree that it has to be run separately from the client.”); 30:28-39 (Q: "Did [the Apple expert] say it was run separately from the client program?” A: "Yes.”); 45:09-11 ("it's run at the analyzer server separately”); 45:27-33 (Q: "[T]he question is whether it runs separately.” A: "And Dr, Mowry [Apple expert] said it was.”).

. I agree with Chief Judge Prost’s and Judge Dyk's dissents in that the majority’s application of law to the facts of this case seems inconsistent with Supreme Court precedent on obviousness and substantial evidence.